1

2

3

4

5

6                              UNITED STATES DISTRICT COURT
                              EASTERN DISTRICT OF WASHINGTON

7   ELAINE L. CHAO, Secretary of      )
8   Labor, United States              )    No. CV-07-0354-CI
    Department of Labor,              )
9                                     )
                    Petitioner,       )    REPORT AND RECOMMENDATION
10                                     )    FOR ORDER GRANTING
    v.                                )    RESPONDENT'S MOTION TO
11                                     )    QUASH, DENYING PETITION FOR
    SPOKANE TRIBE OF INDIANS          )    ENFORCEMENT OF SUBPOENA, AND
12   d/b/a/Chewelah Casino,            )    DISMISSING PETITION
                                      )
13                    Respondent.       )
    ─────────────────────────────────
14

15       Before the court is the United States Secretary of Labor's

16   (Petitioner) Petition for Enforcement of an Administrative Subpoena

17   (Ct. Rec. 1) and the Spokane Tribe of Indians' (Respondent) Motion to

18   Quash (Ct. Rec. 19).  A hearing with telephonic oral argument took

19   place on November 30, 2007.  Evan H. Nordby, United States Office of

20   the Solicitor, represented Petitioner; Lewis M. Schrawyer represented

21   Respondent.   The parties have not consented to proceed before a

22   magistrate judge.

23       After the hearing, the court requested additional information

24   and briefing. Respondent filed a copy of the 2007 Gaming Compact

25   between the Spokane Tribe of Indians and the State of Washington;

26   relevant portions of policy and procedure manuals for the Chewelah

27

28   REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO
    QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING
    PETITION - 1

1  Casino; the Spokane Tribal Employment Rights Ordinance of 1995; a
2  1993 Resolution authorizing the Spokane Tribal Business Council to
3  assume the role as Tribal Gaming Commission; and a full description
4  of the nature of the land on which the Casino is located.  (Ct. Rec.
5  35-39.)  In addition, Respondent filed a supplemental brief.  (Ct.
6  Rec. 56.)

7      Petitioner submitted supplemental briefing regarding the
8  penalties authorized by the Fair Labor Standards Act (29 U.S.C. §§
9  201, *et seq.*) and their applicability to an Indian tribe.  (Ct. Rec.
10  60, 58.)

11      Having reviewed the file and considered the parties arguments,
12  **IT IS RECOMMENDED** that Respondent's Motion to Quash be **GRANTED**, and
13  Petitioner's Petition for Enforcement of an Administrative Subpoena
14  be **DENIED and DISMISSED** for lack of jurisdiction.

15                              **BACKGROUND**

16      The Department of Labor (DOL) filed its Petition for Enforcement
17  of an Administrative Subpoena after the Spokane Tribe of Indians
18  (Tribe) refused to provide requested wage and hour records for
19  employees working at the Chewelah Casino (Casino).  The subpoena is
20  part of an investigation launched as a result of alleged violations
21  of the Fair Labor Standards Act (FLSA) in a complaint forwarded to
22  the Washington State Department of Labor and Industries in August
23  2007.

24      The Tribe responded to the subpoena with a Motion to Quash, in
25  which it contends that as a sovereign nation, it is not subject to
26  the provisions of the FLSA.  The Tribe asserts that because DOL

27

28  REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO
    QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING
    PETITION - 2

1    jurisdiction is lacking, it is not subject to the subpoena.

2         DOL argues that even as a sovereign nation, the Tribe is subject

3    to federal suit.  It contends that FLSA is a statute of general

4    applicability, and therefore applies to Indian tribes unless they are

5    expressly excluded.

6                                  **FACTS**

7    A.   The DOL Administrative Subpoena

8         No details of the complaint, or complainant(s), that triggered

9    the DOL investigation have been provided.  DOL asserted at the

10   hearing that the complainant is entitled to confidentiality.  The

11   subpoena directs the Tribe to provide wage records and books,

12   documents, and other tangible things regarding "all other conditions

13   and practices of employment" from June 15, 2005, until the present.

14   The subpoena includes requests for copies of W-2 forms for all

15   employees, phone numbers of all employees, annual gross sales for the

16   past three years, names of three suppliers/vendors from outside the

17   state of Washington, and copies of all employment contracts, pay

18   stubs, etc. (Ct. Rec. 1, Ex. D, Att. 1.)

19   B.   The Casino[1]

20

21   _____

22        [1] Petitioner, citing *E.E.O.C. v. Karuk Tribe Housing Authority*,

23   260 F.3d 1071, 1077 (9th Cir. 2001), contends a fact-based inquiry by

     the court is barred at the subpoena enforcement stage.  (Ct. Rec. 23

24   at 14.)  However, the court's inquiry into facts in this matter is

25   necessary to assess whether the Casino is an essential governmental

26   function excepted from federal regulation, and is not for the

27

28   REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO
     QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING
     PETITION - 3

1    The Casino is owned and operated by the Tribe and is open for

2  business to tribal members and non-members.   The Tribal Business

3  Council oversees the operation of the Casino.  Although the Casino is

4  not within the boundaries of the Tribe reservation, it is on the

5  Mistequa Allotment deeded to the federal government to be held in

6  trust for the Tribe.  (Ct. Rec. 37 at 17.)  A letter from the U.S.

7  Department of Interior, Bureau of Indian Affairs in Portland, Oregon,

8  dated June 12, 1989, submitted by Respondent states: "[I]t is the

9  position of this office that the subject land [Allotment No. CH2,

10 allotted to Mistequa pursuant to the Act of July 4, 1884] falls

11 within the definition of Indian Country and the restrictions against

12 alienation without the approval of the Secretary continues [sic] in

13 force and effect."  (Ct. Rec. 37 at 16.)

14    The Tribe operates two casinos.  Unlike other Tribe enterprises

15 that are managed by an Enterprise Board, the two casinos are under

16 direct control of the Tribal Business Council.  The income from these

17 two enterprises funds Tribal programs such as the Senior Citizen

18 programs, programs for developmentally disabled adults, a fire

19 department and EMT program, general food distribution program, social

20 service programs for families involved in dependency proceedings,

21 drug programs, mental health programs, a culture program, Tribal

22 college, as well as government and administrative programs, natural

23 resource programs, including park rangers, and Lake Roosevelt

24

25 purposes of identifying a defense to allegations of FLSA violations.

26 *See* discussion *infra* at 9-11.

27

28 REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO
   QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING
   PETITION – 4

1  recreational activities.  (Ct. Rec. 21, Declaration of Carol Evans,

2  Chief Financial Officer of the Tribe.)

3      Chief Financial Officer Evans represents that the two casinos

4  generate most of the enterprise income.  She states that "the

5  majority of the income beyond operating expenses from the two Tribal

6  casinos goes into the general fund," and "casino income is

7  inseparable from government activities." (Ct. Rec. 21 at 2.)

8  C.    Casino Employees

9      At the November 30, 2007, hearing, counsel for both parties

10 represented that the Casino employs non-members as well as Tribe

11 members.  The Chewelah Casino Policy Manual (Manual) includes

12 provisions regarding Casino employee wages, overtime, performance and

13 grievance procedures, among other topics.  (Ct. Rec. 39.)  There is

14 no minimum wage guarantee; rather, the Manual provides that the

15 Casino will "make every effort to pay wages and salaries which are

16 competitive with those rates being paid to similar positions within

17 this geographic region." (Ct. Rec. 39 at 4-5.)  A casino employee

18 must grieve any objections to pay or employment conditions through

19 the Tribal grievance process.  (Ct. Rec. 39 at 8-10.)

20     The Manual expressly provides that wage policies "may be

21 unilaterally modified or revoked at any time." (Ct. Rec. 39 at 5.)

22 Modification of wages, including the minimum wage, are at the

23 Casino's "sole discretion."  The Manual specifically states,

24 "[s]alaried employees are exempt from the overtime provisions of the

25 Federal Wage and Hour Law and do not receive overtime." (*Id.*)

26 Hourly employees are paid overtime at time and a half of regular pay

27

28 REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO
   QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING
   PETITION - 5

1  for more than forty hours in a week and work on holidays. (*Id.* at 5-
2  6.)

3       The Spokane Tribal Employment Rights Ordinance of 1995 (TERO)
4  (Ct. Rec. 36) appears to regulate employment relations between Tribe
5  members "on or near" the Reservation and on-Reservation employers.
6  (Ct. Rec. 36 at 6, 36.)  "Reservation" is defined as land "within the
7  boundaries of the Spokane Indian Reservation and any trust lands
8  under jurisdiction of the Spokane Tribe, wherever they are located."
9  (*Id.* at 9.)  The TERO's stated purpose is to require fair employment
10 of, and prevent discrimination against, Indians by Reservation
11 employers.    The Tribe, the state of Washington and the Federal
12 Government are excluded from the TERO provisions, unless they engage
13 in a "business for profit" as defined in the TERO, *i.e.*, "any
14 business, enterprise, or operation which is not considered a non-
15 profit or not-for-profit organization by the IRS."  (*Id.* at 6-7.)[2]

16      The Commission that governs TERO provisions expressly retains
17 "all rights and privileges of Sovereign Immunity of the Spokane Tribe
18 of Indians." (*Id.* at 11.)   The Commission is granted specific
19 authority to adopt EEOC guidelines, and enter into cooperative
20 agreements with federal agencies such as EEOC and Office of Federal
21 Contract Compliance Programs of the U.S. (OFCCP).   (*Id.*)   The
22 Commission may require Reservation employers to "give preference to

23

24       [2] As discussed above, the Casino is on allotment land which is
25 considered Indian Country.  Under the current record, it is assumed
26 that the Casino is a business for profit.

27

28 REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO
   QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING
   PETITION – 6

1   Tribal and other Indian-owned businesses in the award of contracts
2   and subcontracts." (*Id.*) Employers subject to the TERO are required
3   to "give preference to local Indians in hiring, promotion, training
4   and all other aspects of employment, contracting or subcontracting,
5   and must comply with this Ordinance and the Rules, Regulations and
6   orders" of the Commission. (*Id.* at 13.)

7       Labor unions with collective bargaining agreements with
8   employers working on the Reservation are required to comply with
9   TERO, including the filing of a "written agreement stating that the
10  union will comply with this Ordinance and the rules, regulations and
11  orders of the Commission."  Absent this written agreement, union
12  employees may not begin work on the Reservation.  (*Id.* at 20-21.)
13  There are provisions for grievances, enforcement of provisions,
14  penalties, appeals, confiscation and sale of a non-compliant party's
15  property by Tribal police.  (*Id.* at 22-31.)

16      Section 14.0 of the TERO deals with Wage and Hour Standards, and
17  requires the employer to pay the highest rate of pay when "Federal,
18  State and local wage, rates and guidelines are used."  It also allows
19  the Commission to use federal, state or local agencies in resolving
20  wage and hour issues.[3]  (*Id.* at 33.)  If an employer does not comply
21  with these wage provisions, it is subject to the sanctions mentioned
22  above.

23

24      [3] Section 14.3 provides: "The Commission or the Director may use
25  Federal, State, local or Tribal agencies in resolving a discrepancy
26  concerning wages and hours worked."
27

28  REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO
    QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING
    PETITION - 7

1   D.    The 2007 Gaming Compact

2          After two years of negotiations,[4] the Tribe signed a Gaming

3   Compact with the state of Washington in 2007 (Compact), as authorized

4   in the federal Indian Gaming Regulatory Act, 25 U.S.C. § 2701-2721

5   (IGRA).[5]  (Ct. Rec. 35.)  According to the Compact, the principal goal

6

7   _____

          [4] The Tribe has a history of conflict regarding its right to run

8   casinos.  The Resolution authorizing the Tribe to sign the Compact

9   states, "[F]or over 16 years, the Tribe has been involved in

10  negotiations and litigation with the United States and with the State

11  of Washington concerning the Tribe's inherent right to engage in

12  Class III Gaming, as that term is defined in the Indian Gaming

13  Regulatory Act."  (Ct. Rec. 35 at 3.)

14         [5] IGRA was passed in 1988 to regulate Indian gaming.  The stated

15  purpose of the IGRA is "to promote tribal economic development,

16  tribal self-sufficiency and strong tribal government."  25 U.S.C. §

17  2701(4).  It also provides that the Tribe has "the exclusive right to

18  regulate gaming activity on Indian Land if the gaming activity is not

19  specifically prohibited by Federal Law and is conducted within a

20  State which does not . . . prohibit such gaming activity."  *Id.* §

21  2701 (5).  The statute provides that "[n]othing in this chapter

22  precludes an Indian tribe from exercising regulatory authority

23  provided under tribal law over a gaming establishment within the

24  Indian tribe's jurisdiction if such regulation is not inconsistent

25  with this chapter or with rules or regulations adopted by the

26  [National Indian Gaming] Commission."  25 U.S.C. § 2713(d); (Ct. Rec.

27

28  REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO
    QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING
    PETITION - 8

1  of federal Indian policy is "to promote tribal economic development,

2  tribal self-determination and a strong government to government

3  relationship." (*Id.* at 11.)  The Tribe specifically agreed, under 25

4  U.S.C. § 2710 (b)(2)(B), to use net revenues from gaming "to fund

5  tribal government operations or programs, to provide for the general

6  welfare of the Tribe and its members, to promote tribal economic

7  development, to donate to charitable organizations, or to help fund

8  operations of local government agencies." (Ct. Rec. 35 at 11.)

9      The Compact requires every Casino employee to be licensed by the

10 Tribal Gaming Commission, which is, in fact, the Tribal Business

11 Council.   The Tribal government has primary responsibility for

12 investigating and approving all applicants.   After a temporary

13 license is issued by the Tribe, eligibility is verified by the State

14 Gaming Agency. (Ct. Rec. 35 at 19-22.)   The Tribe is authorized to

15 enact regulations for the operation and management of gaming

16 operation. (Ct. Rec. 35 at 18, 31.)  The Compact expressly states

17 the Tribe does not waive its sovereign immunity except as set forth

18 in the terms of the Compact. (Ct. Rec. 35 at 29-30.)

19                              **ISSUES**

20 1.   Is the issue before the court a pure question of jurisdiction
        that should be resolved at the subpoena-enforcement stage?

21

22 2.   Is the FLSA a statute of general applicability that applies to
        Indian tribes, even though the statute is silent regarding
        Indian tribes?

23

24 3.   Assuming FLSA applies generally, does DOL jurisdiction extend to
        the regulation of employees at the Casino?

25

26 ────────────

27 20 at 24.)

28 REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO
   QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING
   PETITION - 9

1                           **DISCUSSION**

2    A.   <u>Court Enforcement of Administrative Subpoena</u>

3         Generally, the scope of judicial inquiry in an agency subpoena

4    enforcement  proceeding  is  narrow.    The  critical  questions  are

5    "whether Congress has granted the authority to investigate;" "whether

6    procedural  requirements  have  been  followed;"  and  "whether  the

7    evidence is relevant and material to the investigation."  *Karuk*, 260

8    F.3d at 1076.  Unless the evidence sought is "plainly incompetent or

9    irrelevant" to "any lawful purpose of the agency," a subpoena should

10   be enforced.  *Id.*

11        An administrative subpoena may be quashed where (1) "there is

12   clear evidence that exhaustion of administrative remedies will result

13   in  irreparable  injury;  (2)  the  agency's  jurisdiction  is  plainly

14   lacking; and (3) the agency's special expertise will be of no help on

15   the question of its jurisdiction."  *Id.* at 1077.

16        In *Karuk*, the EEOC sought court enforcement of an investigative

17   subpoena  served  on  the  Karuk  Indian  tribe  stemming  from  an  ADEA

18   complaint.   The  complainant  was  a  tribal  member  and  former  employee

19   of the tribal housing authority who believed he was dismissed because

20   of  his  age.   He  filed  a  complaint  with  EEOC,  which  opened  an

21   investigation  and  issued  an  administrative  subpoena  to  the  tribe.

22   The tribe refused to comply, arguing that as a sovereign nation, it

23   was  not  subject  to  the  ADEA  laws,  and  therefore  not  required  to

24   respond to the agency's subpoena.   EEOC sought judicial enforcement.

25   The  district  court  issued  an  order  of  enforcement;  the  tribe

26   appealed,  and  the  court  of  appeals  reversed,  holding  that  because

27

28   REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO
     QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING
     PETITION – 10

ADEA did not apply to the tribe under the circumstances of the case, enforcement of the subpoena should be denied.  *Id*. at 1082.

The *Karuk* court distinguished between challenges to an agency's subpoena based on "coverage" and those based on "jurisdiction," stating:

> [C]ourts should not refuse to enforce an administrative subpoena when confronted by a fact-based claim regarding coverage or compliance with the law . . . .
>
> . . .
>
> . . . There is a difference, particularly in the case of Indian tribes, between the determination whether an agency has regulatory jurisdiction to enforce a subpoena in the first instance, and the very different question whether a subpoena recipient has a defense to liability under the applicable statute.

*Id.* at 1076-1077.  Once the distinction is made, the court must determine if the question of jurisdiction is ripe for determination. *Id.* at 1077.  The *Karuk* court reasoned that if an agency does not have jurisdiction, and the Indian tribe is not subject to the federal laws that authorized the administrative investigations, the court's enforcement of a subpoena would result in a burden and "irreparable injury vis-a-vis the tribe's sovereignty."  It also found EEOC did not have any special expertise that would be helpful in interpreting the statute "with respect to Indians."  Therefore, the Karuk tribe's challenge to the ADEA's jurisdiction was held to be properly addressed at the subpoena-enforcement stage. *Id.* at 1078.

Here, both parties appear to agree that *Karuk* is dispositive on the issue of whether court intervention is appropriate at this stage. The Tribe contests jurisdiction of the federal agency over Tribal

REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING PETITION - 11

1  employees and DOL does not allege special expertise over this Indian
2  matter.   The court is not asked to determine if the Tribe has
3  defenses to allegations of wage violations.   If jurisdiction is
4  lacking, to require compliance at this stage would be injurious to
5  the Tribe's sovereignty; therefore, it is appropriate to resolve the
6  issue at the subpoena enforcement stage.
7  B.   <u>Federal Regulation of Indian Tribe Activities</u>
8       Although Indian tribes enjoy a unique sovereign immunity status
9  from private law suits, they are not immune from suits brought by the
10  federal government. *Karuk,* 260 F.3d at 1075.   Further, Congress's
11  authority over tribal matters "is extraordinarily broad," and
12  Congress has the power to divest Indian tribes of their sovereign
13  authority by explicit legislation.   *Santa Clara Pueblo v. Martinez*,
14  436 U.S. 49, 58 (1978).   However, this plenary power is tempered by
15  a traditional recognition that Indian tribes have an inherent power
16  to regulate matters of local self government and "make their own
17  substantive law in internal matters."   *Id*. at 55.   Although *Santa*
18  *Clara Pueblo* addressed the issue of a private individual's right to
19  sue an Indian tribe in federal court under the Indian Civil Rights
20  Act, the Court was clear in its holding that Congressional intent to
21  intrude on tribal sovereignty must be explicit: "[U]nless and until
22  Congress makes it clear its intention to permit the additional
23  intrusion on tribal sovereignty that adjudication . . . in a federal
24  forum would represent, we are constrained to find that [ICRA], does
25  not impliedly authorize actions for declaratory or injunctive relief
26  against either the tribe of its officers."   *Id*. at 72.

27

28  REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO
QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING
PETITION – 12

1  Against the backdrop of Congressional plenary power and an

2  Indian tribe's sovereignty, the Supreme Court addressed an Indian

3  tribe's power to regulate activities of nonmembers on lands within

4  its reservation in *Montana v. United States,* 450 U.S. 544, 565-66

5  (1981):

6       A tribe may regulate, through taxation, licensing, or other
        means, the activities of nonmembers who enter consensual
7       relationships with the tribe or its members, through
        commercial dealing, contracts, leases, or other
8       arrangements. . . . A tribe may also retain inherent
        power to exercise civil authority over the conduct of non-
9       Indians on fee lands within its reservation when that
        conduct threatens or has some direct effect on the
10      political integrity, the economic security, or the health
        or welfare of the tribe.

11

12  *Id*. (Citations omitted.)

13  In a more recent case, *Nevada v. Hicks*, 533 U.S. 353 (2001), the

14  Court held "Indian tribes' regulatory authority over nonmembers is

15  governed by the principles set forth in [*Montana*], which we have

16  called the 'pathmaking case' on the subject." *Id*. at 358. The Court

17  also found "[t]he ownership status of the land . . . is only one

18  factor to consider in determining whether regulation of the

19  activities of nonmembers is 'necessary to protect tribal self-

20  government or to control internal relations.'" *Id*. at 359-60

21  (*quoting Montana,* 450 U.S. at 564-65).

22  Although *Montana* and *Hicks* dealt with tribal court jurisdiction

23  in civil matters, the holdings are instructive regarding consensual

24  economic relationships between members and nonmembers and an Indian

25

26

27

28  REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO
    QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING
    PETITION – 13

tribe on tribal land.[6]  The general rule gleaned from these Supreme Court cases is that tribal power over nonmembers "'is inconsistent with the dependent status of the tribes,'" and cannot be exercised without express congressional delegation, _except_ where that power is "'necessary to protect tribal self-government or to control internal relations.'"  *Hicks*, 533 U.S. at 359-60 *(quoting Montana*, 450 U.S. at 564).  It is that exception that is relevant to the case before the court here.

Consistent with the *Montana* rule, in *Smith v. Salish Kootenai College,* 434 F.3d 1127, 1138 (9th Cir. 2006), also a challenge to tribal court jurisdiction, the Ninth Circuit stated "Nonmembers of a tribe who choose to affiliate with the Indians or their tribes [through a consensual relationship] may anticipate tribal jurisdiction when their contracts affect the tribe or its members." *Id.*  Although the issue in *Montana* and *Smith* was tribal court

---

[6] Under IGRA, tribal gaming activities must be on Indian land. 25 U.S.C. § 2701(5); *see also* Ct. Rec. 35 at 10 (Compact).  Further, 25 U.S.C. § 2703(4) defines Indian lands to include land held in trust by the United States for the benefit an a tribe and "over which an Indian tribe exercises governmental power," and documentation submitted by the Tribe establishes the land on which the Casino is located was deeded to the United States in 1982, to be held in trust for the benefit of the Tribe.  (Ct. Rec. 37 at 17.) DOL appears to concede that the location of the Casino is not dispositive.  (Ct. Rec. 58 at 21.)

REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING PETITION – 14

jurisdiction, the holding in *Montana* is important here because Casino employees are on Tribal land in a consensual economic relationship with the Tribal government. Casino employees are subject to background checks and licensing by the Tribe, and their employment relationship is governed by detailed tribal ordinances regulating employees and employers. According to *Montana*, the Tribe may regulate the consensual relationships with Casino employees if their activities have some "direct effect on the political integrity, the economic security, or the health or welfare of the tribe direct."

Further, in determining the application of a federal statute to the activities of an Indian tribe, the normal rules of statutory construction do not apply, even where non-treaty rights and issues are involved. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) (canons of statutory construction "do not have their usual force in cases involving Indian law"); *Oneida County, N.Y. v. Oneida Indian Nation of New York State,* 470 U.S. 226, 247 (1985) (liberal construction of federal statutes in favor of the Indians in non-treaty matters); *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 152 (1982) (consistent with policy of encouraging tribal self-sufficiency and traditional notions of sovereignty, ambiguities in federal law are "construed generously" in favor of Indian tribes) (quoting *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143-44 (1980)).

In a Seventh Circuit decision, Judge Posner held that FLSA did not apply to the regulation of tribal law enforcement officers, and reasoned as follows:

> The courts have spoken of the "inherent sovereignty" of
> Indian tribes and have held that it extends to the kind of

> regulatory functions exercised by the [tribal] Commission with respect to both Indians and non- Indians. . . . The idea of comity-of treating sovereigns, including such quasi-sovereigns as states and Indian tribes, with greater respect than other litigants-counsels us to exercise forbearance in construing legislation as having invaded the central regulatory functions of a sovereign entity.

*Reich v. Great Lakes Indian Fish and Wildlife Com'n*, 4 F.3d 490, 494-95 (7th Cir. 1993) (citations omitted). Addressing the DOL's argument that application of FLSA to Indian employees would benefit those individuals by imposing minimum wage and overtime regulation, the court stated, "[t]he relevant comity is a duty of forbearance not to individual Indians but to Indian governments, and it would be a conspicuous breach of comity to accuse the latter . . . of not being guided by a sincere concern for the best interests of the former." *Id*. at 495.

Thus, in determining whether a federal statute regulates the activities of quasi-sovereign Indian tribes, a court must be guided by the Indian canons of statutory construction, as well as "the idea of comity," while considering the relationship between the Indian tribe and the individuals being regulated and to what extent the tribal activity is a "central regulatory function."

C.    Federal Statutes of General Applicability

It is well settled that the Ninth Circuit "has not adopted the proposition that Indian tribes are subject only to those laws of the United States expressly made applicable to them." *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113, 1115-16 (9th Cir. 1985). The general rule in the Ninth Circuit is that "federal laws generally applicable throughout the United States apply with equal force to

REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING PETITION – 16

Indians on reservation." *Id.* at 1115 (*quoting United States v. Farris*, 624 F.2d 890 (9ᵗʰ Cir. 1980), *cert. denied*, 449 U.S. 1111 (1981)).

As noted by the D.C. Circuit, "a statute of general applicability can constrain the actions of a tribal government without at the same time impairing tribal sovereignty." *San Manuel Indian Bingo and Casino v. N.L.R.B.*, 475 F.3d 1306, 1312 (D.C. Cir. 2007). In *Coeur d'Alene Tribal Farm,* the Ninth Circuit reconciled the competing principles of the rule of general applicability of federal law to Indians and the quasi-sovereign status of Indian tribes by establishing exceptions to the general rule. In that case, an Indian tribe challenged Occupational Safety and Health Administration inspection and regulation of its commercial farm, which was similar to other farms in the area, employed tribe members and non-members and sold its products to the open market in and out of Idaho. *Coeur d'Alene Tribal Farm,* 751 F.2d at 1114-15. The over-riding issue was whether a federal regulatory agency created by federal statute, had jurisdiction over the federally recognized Indian tribe's enterprise.

The court reiterated the undisputed principle that Congress "has the power to modify or extinguish that right," and explicitly rejected the tribe's argument that silence in a general federal statute regarding application to Indians should be interpreted as excluding Indians. *Id.* at 1115 (*citing Rice v. Rehner*, 463 U.S. 713, 718 (1983)). However, recognizing traditional deference to an Indian tribe's quasi-sovereign status and power to regulate internal

REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING PETITION – 17

affairs essential to self-government, the *Coeur d'Alene* court
articulated exceptions to the general rule: a federal statute of
general applicability applies to an Indian tribe <u>unless</u> one of three
exceptions is established by the record: (1) the law touches on
"exclusive rights of self-governance in purely intramural matters";
(2) the application of the law to the tribe would "abrogate rights
guaranteed by Indian treaties"; or (3) there is proof "by legislative
history or some other means that Congress intended [the law] not to
apply to Indians on their reservations" *Id.* at 1116 (*citing Farris*,
624 F.2d at 893-94).    If any of these three situations exist,
Congress must apply a statute <u>expressly</u> to Indians before the court
will hold that the statute reaches them.    *Id.*

The court reasoned that the tribal farm was not an arm of the
government; rather it was like other commercial enterprises that
competed with the tribal farm, there was no treaty involved, and the
tribe did not argue the legislative history exception.    Thus, the
tribal farm did not meet any of the exceptions in the *Coeur d'Alene*
test, and was not exempt from the provisions of the Occupational
Safety and Health Act, even though the Act was silent as to
applicability to enterprises owned and operated by Indian tribes.
*Id.* at 1116.

Because the *Coeur d'Alene Tribal Farm* decision is binding upon
this court, the analysis of FLSA applicability to Casino employees
necessarily is based on that test.    *See N.L.R.B. v. Chapa De Indian
Health Program, Inc.,* 316 F.3d 995, 999 (9th Cir. 2003).

REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO
QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING
PETITION – 18

D.   <u>Application of FLSA to the Regulation of Casino Employees</u>

     The Tribe argues that the statute does not apply to Indian tribes because, (1) "employer" as defined by FLSA does not include Indian tribes, and (2) FLSA is not a statute of general applicability and Indian tribes are not expressly included in its provisions. (Ct. Rec. 20 at 19.)  Neither argument is persuasive or supported by Ninth Circuit case law.

     It is settled law in the Ninth Circuit that FLSA is a statute of general applicability that generally applies to Indians unless one of the *Coeur d'Alene* exceptions applies.  *Snyder v. Navajo Nation*, 382 F.3d 892, 894-95 (9th Cir. 2004).  In *Snyder*, plaintiffs were Indian tribe law enforcement officers suing the Navajo tribe and the United States for violations of FLSA.  The district court determined FLSA did not apply to the tribe, and dismissed the tribe.  On appeal, the Ninth Circuit applied the *Coeur d'Alene* test to affirm the lower court's determination that FLSA did not apply to tribal law enforcement employees, because tribal law enforcement "was a traditional governmental function," that was intramural.  *Snyder*, 382 F.3d at 895-96.  The court summarized Ninth Circuit law succinctly in this 2004 case involving alleged violations of FLSA overtime pay provisions:

> The FLSA is a statute of general applicability. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 727 (1947).  Such generally applicable statutes typically apply to Indian tribes. *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99 (1960).  There is an exemption, however, where the law would interfere with tribal self-government.  The exemption protects "exclusive rights of self governance in purely intramural matters." *Donovan v. Coeur d'Alene Tribal Farm,* 751 F.2d at 1116; *E.E.O.C. v. Karuk Tribe Housing Auth.,* 260 F.3d 1071, 1078 (9th Cir. 2001) . . .;

REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING PETITION - 19

*See also E.E.O.C. v. Fond du Lac Heavy Equipment and Construction Co., Inc.*, 986 F.2d 246, 249-51 (8th Cir. 1993) (holding that the ADEA was not applicable because the tribe's right of self-government would be affected in the intramural matter of on reservation tribal employment); *Nero v. Cherokee Nation of Okla.*, 892 F.2d 1457, 1463 (10th Cir. 1989) (holding that race discrimination statues did not apply to a tribe's designation of tribal membership criteria).

In *Coeur d'Alene Tribal Farm*, we explained that the tribal self-government exception applied to intramural matters and we specifically mentioned, as examples, conditions of tribal membership, inheritance rules, and domestic relations. 751 F.2d at 1116. In *Karuk*, we followed *Coeur d'Alene Tribal Farm* and held that the employment of tribal members by the tribe's housing authority on the reservation was an intramural matter and that federal age discrimination statutes did not apply. 260 F.3d at 1079-80. While we have not cabined the intramural exception to those listed in *Coeur d'Alene Tribal Farm*, we have been careful to allow such exemptions only in those rare circumstances where the immediate ramifications of the conduct are felt primarily within the reservation by members of the tribe and where self-government is clearly implicated.

*Snyder*, 382 F.3d at 894-95.

In response to arguments that some of the plaintiffs were nonmember law enforcement officers, the *Snyder* court held tribal membership did not affect the analysis; the important factor in its analysis was that the officers served "the interests of the tribe and reservation governance." *Id.* at 896.

Based on this precedent, FLSA applies to the Tribe unless one of the *Coeur d'Alene Tribal Farm* exceptions applies to the facts before the court.

E.   The *Coeur d'Alene* Test

The Tribe argues that even if FLSA is generally applicable, and the Tribe is an employer as defined by FLSA, the Tribe's operation of

REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING PETITION - 20

the Casino implicates its inherent rights of self-governance and, thus, fits into the first *Coeur d'Alene* "self-governance" exception.[7] Petitioner cites cases from other Circuits in support of her argument that the Casino is merely a commercial enterprise, similar to the farm in *Coeur d'Alene Tribal Farm.* (Ct. Rec. 23 at 11). Specifically Petitioner relies on the D.C. Circuit's holding in *San Manuel Indian Bingo and Casino,* in her argument that the Casino does not fit into the "self governance" exception. (Ct. Rec. 23 at 11.) However, *San Manuel Indian Bingo* is distinguishable. The case was a dispute involving competing labor unions and allegations of unfair labor practices by a tribal casino located on the reservations.

Finding that the National Labor Relations Act (NLRA) applied to tribal casino employees, the D.C. Circuit noted that NLRB involvement would have little impact on the tribe's revenue and "negligible" impairment of the tribe's sovereignty, and concluded, "[w]e do not

---

[7] The Tribe also argues FLSA does not apply because the remedies authorized by the FLSA include a private action, criminal sanctions and monetary damages, and these cannot be enforced against a sovereign tribe without an express waiver of immunity. (Ct. Rec. 20 at 11-12.) Petitioner replies that the Occupational Safety and Health Act includes criminal penalties, but was held to apply to the tribe in *Coeur d'Alene Tribal Farm*. (Ct. Rec. 60 at 5.) Because the *Coeur d'Alene* test applies to the facts before this court, to make its determination, the court need not and, therefore, declines to address the issue of permissible remedies.

REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING PETITION - 21

1   think this limited impact is sufficient to demand a restrictive
2   construction of the N.L.R.A." *San Manuel Indian Bingo*, 475 F.3d at
3   1314-15.  Further, the court applied tribal sovereignty principles,
4   and expressly declined to use the *Coeur d'Alene Tribal Farm* framework
5   in its decision, noting, "[o]ut-of-circuit precedent is inconsistent
6   as to the applicability of general federal laws to Indian tribes."
7   The court stated, "[w]e do not decide how the framework we employ
8   would apply to the facts" in cases from other circuits applying the
9   *Coeur d'Alene* test.  *Id.* at 1315.

10      DOL also argues that the Occupational Safety and Health Act
11  (OSHA), ERISA and the National Labor Relations Act (NLRA) have been
12  applied to Indian tribes, specifically where, as here, no treaty
13  rights were involved.  *See Coeur d'Alene Tribal Farm*, 751 F.2d at
14  1115; *Lumber Industry Pension Fund v. Warm Springs Forest Products*
15  *Industries*, 939 F.2d 683 (9th Cir. 1991).  In those cases, however,
16  the tribe's decision-making power and power to regulate consensual
17  economic relationships with tribal government were not usurped by the
18  disputed regulation; and the economic relationships at issue in those
19  cases did not directly effect the economic security of the tribe.
20  Further, in *NLRB v. Chapa De Indian Health Program, Inc.*, 316 F.3d
21  995, 997 (9th Cir. 2003), cited by Petitioner, (Ct. Rec. 58 at 10),
22  where the court held the tribal organization was not excepted from
23  the NRLA, the employer (Chapa De) was not a tribe.  It was a non-
24  profit tribal organization, financially independent from the Indian
25  tribe, that served members and non-members outside the reservation.
26  Therefore, no issues of self-governance were implicated.  *Id.*

27

28  REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO
    QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING
    PETITION - 22

In a more recent Ninth Circuit case, *Allen v. Gold Country
Casino,* 464 F.3d 1044 (9th Cir. 2006), the court examined a tribal
casino's relationship vis-a-vis essential governmental functions.
*Allen* is distinguishable from the instant case because it involved a
suit by a private party against a tribal casino, and tribal sovereign
immunity was extended to the casino because it was an "arm of the
tribe." *Allen*, 464 F.3d at 1047.   Although the court did not use
the *Coeur d'Alene* test, its analysis of the tribal casino's
relationship with tribal government is instructive here.

The Gold Country Casino was similar to the Casino: It was owned
and operated by the Indian tribe, was created pursuant to IGRA and a
gaming compact with the state of California, "on a government-to-
government basis," and provided significant income to the Tribe. *Id.*
at 1046.   A former casino employee sued the Indian tribe doing
business as a casino for alleged retaliatory discharge.   The court
held the tribal casino (unlike the *Coeur d'Alene* tribal farm which
was characterized as a commercial enterprise like other farms in the
area) was an "arm of the Tribe"; therefore, it was immune from suit
by a private party.

In its discussion of the creation and function of the tribal
casino, the court stated:

> These extraordinary steps [*i.e.,* various levels of
> government approval] were necessary because the Casino <u>is
> not a mere revenue-producing tribal business</u> (although it
> is certainly that).  The IGRA provides for the creation and
> operation of Indian casinos to promote "tribal economic
> development, self-sufficiency, and strong tribal
> governments."  24 U.S.C. § 2702(1).  One of the principal
> purposes of the IGRA is "to insure that the Indian tribe is
> the primary beneficiary of the gaming operation." *Id.* §
> 2702(2).  The compact that created the Gold Country Casino

REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO
QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING
PETITION - 23

provides that the Casino will "enable the Tribe to develop
self-sufficiency, promote tribal economic development and
generate jobs and revenues to support the Tribes's
government and governmental services and programs."

. . .

. . . In light of the purposes for which the Tribe founded
this Casino and the Tribe's ownership and control of its
operations, there can be little doubt that the Casino
functions as an arm of the Tribe.

*Id*. at 1046-47. (Emphasis added.)

Here, Petitioner argues the Casino operation is not a traditional governmental function; rather, it is a commercial enterprise which is not located on reservation land.[8] The Tribe asserts that the Casino is at the heart of its intramural matters, because the income derived from the Casino funds the majority of its Tribal programs. The issue, therefore, is whether the regulation of Casino employees clearly implicates the Tribe's inherent powers of self-government and regulation of intramural matters.

Examples of "intramural matters" given by the *Coeur d'Alene Tribal Farm* court were those affecting "conditions of tribal membership, inheritance rules, and domestic relations." *Id.* at 1116. However, as explained by the *Snyder* court, "intramural matters" are not confined to those examples given in the *Coeur d'Alene* decision. Rather, laws that usurp a tribal government's decision-making power

_____

[8] Although the Casino is not on the reservation, it is located indisputably on Indian trust land, and the Supreme Court has held that ownership status, alone, is not dispositive in jurisdiction issues. *Hicks*, 533 U.S. at 359.

REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING PETITION - 24

and are "felt primarily within the reservation by members of the tribe" are considered "aspects of self-government" and should be excepted from the general rule. *Snyder*, 382 F.3d at 894-95 (FLSA does not apply to regulation of tribal police); *see also Karuk*, 260 F.3d at 1081 (ADEA does not apply to tribal housing authority employee); *E.E.O.C. v. Fond du Lac Heavy Equipment and Construction Co., Inc.*, 986 F.2d 246, 249-51 (8th Cir. 1993)(application of ADEA affects the tribe's right of self-government in the intramural matter of on reservation tribal employment). "The term 'tribal self-government,' or a similar term, encompasses a tribe's ability to make at least certain employment decisions without interference from other sovereigns." *Karuk*, 260 F.3d at 1082 (*citing Penobscot Nation v. Fellencer*, 164 F.3d 706, 709-11 (1st Cir. 1999), *cert denied,* 527 U.S. 1022, (1999); *Pink v. Modoc Indian Health Project, Inc.*, 157 F.3d 1185, 1188 (9th Cir. 1998); *Reich,* 4 F.3d at 494-96 ("it has been traditional to leave the administration of Indian affairs for the most part to the Indians themselves"). Thus, "intramural" matters encompass those activities that implicate the Tribe's right of self-government and impact primarily the members of the tribe.

The holdings cited by Petitioner are not inconsistent with a holding that FLSA does not apply to the Tribe's regulation of Casino employees under the circumstances before the court. Casino employees are hired and licensed by the Tribal governing body and regulated by Tribal and state law. Tribe members and nonmembers have a consensual economic agreement with a Tribal enterprise on Tribal land that (1) would not exist but for express authorization by federal law (IGRA),

(2) is regulated by a combination of tribal, state and federal law, (3) is wholly owned and operated by the Tribal government, and (4) supports the economic viability of the Tribe, including the majority of intramural programs sponsored by the Tribe, as evidenced by the express pledge of net revenues to Tribal programs.  The application of FLSA would cause significantly more impact on Tribal revenue and, therefore the members of the Tribe who depend on the intramural programs, than NLRB intrusion into tribal activities described in *San Manuel Bingo,* OSHA's inspection of workplace safety in *Coeur d'Alene Tribal Farm*, or the application of ERISA to tribal pension plans in *Warm Springs Forest Products*.  Like the casino in *Allen*, the Casino is not "a mere revenue producing tribal business." It is created and operated for the primary purpose of supporting the Tribe's government and governmental services.  The employees serve the economic interests of the Tribe, and interference with the Tribe's ability to regulate these employees impermissibly interferes with the Tribe's administration of internal affairs and would have a direct effect on the "political integrity, the economic security . . . and welfare" of the Tribe.  *Montana,* 450 U.S. at 566.

## CONCLUSION

The Casino is the major source of income for Tribal intramural functions, and is an arm of the Tribal government.  Casino employees are in a consensual, economic relationship, traditionally left to the Tribe to regulate.  The Casino is formed and regulated by tribal, state and federal law.  DOL's description of the Casino as "simply a business entity that happens to be run by a tribe" does not extend

REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING PETITION – 26

1  the comity that the Supreme Court has deemed due a quasi-sovereign
2  federally recognized Indian tribe.  Under the narrow and undisputed
3  facts before the court, FLSA does not apply to the Casino employees
4  under the "matters of self-governance" exception of the *Coeur d'Alene*
5  test.  Because Petitioner is without regulatory jurisdiction over the
6  Tribe with respect to Casino employees, the subpoena should not be
7  enforced.  Accordingly,

8      **IT IS RECOMMENDED** that:

9      1.   Respondent's Motion to Quash be **GRANTED.**

10     2.   Petitioner's Petition for Enforcement of an Administrative
11  Subpoena be **DENIED AND DISMISSED** for lack of jurisdiction.

12                          **OBJECTIONS**
13  Any party may object to a magistrate judge's proposed findings,
14  recommendations or report within ten (10) days following service with
15  a copy thereof.  Such party shall file written objections with the
16  Clerk of the Court and serve objections on all parties, specifically
17  identifying any the portions to which objection is being made, and
18  the basis therefor.  Any response to the objection shall be filed
19  within ten (10) days after receipt of the objection.  Attention is
20  directed to Fed. R. Civ. P. 6(e), which adds another three (3) days
21  from the date of mailing if service is by mail.

22      A district judge will make a de novo determination of those
23  portions to which objection is made and may accept, reject, or modify
24  the magistrate judge's determination.  The judge need not conduct a
25  new hearing or hear arguments and may consider the magistrate judge's
26  record and make an independent determination thereon.  The judge may,

27

28  REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO
QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING
PETITION - 27

1  but is not required to, accept or consider additional evidence, or

2  may recommit the matter to the magistrate judge with instructions.

3  *United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000); 28 U.S.C.

4  § 636(b)(1)(B) and (C), Fed. R. Civ. P. 73; LMR 4, Local Rules for

5  the Eastern District of Washington.

6      A magistrate judge's recommendation cannot be appealed to a

7  court of appeals; only the district judge's order or judgment can be

8  appealed.

9      The District Court Executive is directed to file this Report and

10  Recommendation and provide copies to counsel and the referring

11  district judge.

12      DATED March 5, 2008.

13

14                    S/ CYNTHIA IMBROGNO
                 UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28  REPORT AND RECOMMENDATION FOR ORDER GRANTING RESPONDENT'S MOTION TO
    QUASH, DENYING PETITION FOR ENFORCEMENT OF SUBPOENA, AND DISMISSING
    PETITION – 28