UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ELAINE L. CHAO, Secretary of Labor, United States Department of Labor,<br><br>    Petitioner,<br><br>  v.<br><br>SPOKANE TRIBE OF INDIANS,<br><br>    Respondent. | NO. CV-07-0354-CI<br><br>**ORDER DECLINING TO ADOPT REPORT AND RECOMMENDATION AND DENYING MOTION TO QUASH** |

Before the Court for review is Magistrate Judge Cynthia Imbrogno's Report and Recommendation for Order Granting Respondent Spokane Tribe of Indians' ("the Tribe") Motion to Quash an administrate subpoena. (Ct. Rec. 61.) After reviewing the material on file and the applicable legal authority, the Court respectfully disagrees with the Report and Recommendation. For the reasons given below, the Court denies the Tribe's motion to quash.

**BACKGROUND**

After years of negotiations,[1] the Tribe signed a Gaming Compact

---

[1] The Resolution authorizing the Tribe to sign the Compact states, "[F]or over 16 years, the Tribe has been involved in negotiations and litigation with the United States and with the State of Washington concerning the Tribe's inherent right to engage in Class III Gaming, as that term is defined in the Indian Gaming

ORDER - 1

with the state of Washington in 2007 ("the Compact"), as authorized by the federal Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701-2721.  It is undisputed for purposes of this motion that the Tribe's casino in Chewelah ("the Casino") is operated consistent with the IGRA and the Compact.  The Casino, which is owned and operated by the Tribe, employs, and is open to, both tribal members and non-members.

The Tribal Business Council controls the operation of the Casino, which is located on trust land.  (Ct. Rec. 37 at 16 & 17.) Consistent with the Compact, the Tribe uses the casino[2] income to fund the fire department, tribal college, and a variety of tribal programs, such as senior citizen, developmentally-disabled adult, EMT, general food distribution, social service, mental health treatment, drug treatment, cultural education, and natural resource programs.  Casino income comprises the majority of the Tribe's income and once placed into the tribal general fund is inseparable from tribal government activities.  (Ct. Rec. 21 at 2.)

The Department of Labor (DOL) filed its Petition for Enforcement of an Administrative Subpoena after the Tribe refused to provide requested wage and hour records for employees working at the Casino.[3]  The subpoena is part of an investigation into alleged Fair

---

Regulatory Act." (Ct. Rec. 35 at 3.)

[2]  The Tribe operates another casino, in addition to the Chewelah Casino.

[3]  Specifically, the subpoena directs the Tribe to provide wage records and books, documents, and other tangible things regarding "all other conditions and practices of employment" from June 15,

ORDER - 2

Labor Standards Act (FLSA) violations launched as a result of a complaint forwarded to the Washington State Department of Labor and Industries in August 2007. The Tribe responded to the subpoena with the instant motion to quash, contending it is a sovereign nation that is not subject to the provisions of the FLSA. DOL argues that the Tribe, even as a sovereign nation, is subject to the FLSA - a statute of general applicability.

## AUTHORITY & ANALYSIS

**A.    Court Review of An Administrative Subpoena**

Generally, the scope of judicial inquiry into an agency supboena enforcement proceeding is narrow. *EEOC v. Karuk Tribal Housing Auth.* ("*Karuk*"), 260 F.3d 1071, 1076 (9th Cir. 2001). However, an administrative subpoena may be quashed by a court if the agency lacks jurisdiction. *Id.* at 1077. Accordingly, the Court below determines whether the DOL has jurisdiction to subpoena the Casino's employment records pursuant to the FLSA; the Court is not determining whether the Tribe has any defenses to the FLSA violation allegations.

**B.    Application of the FLSA to the Casino**

The analysis of whether a tribe is entitled to immunity is full of twists and turns. Although Indian tribes enjoy sovereign

---

2005, until the present. The subpoena includes requests for copies of W-2 forms for all employees, phone numbers of all employees, annual gross sales for the past three years, names of three suppliers/vendors from outside the state of Washington, and copies of all employment contracts and pay stubs. (Ct. Rec. 1, Ex. D, Att. 1.)

ORDER - 3

immunity from private lawsuits, they are not immune from suits brought by the federal government. *Karuk*, 260 F.3d at 1075. In particular, a tribe is not entitled to immunity involving a federal statute of general applicability that is silent on the issue of applicability to Indian tribes, absent satisfaction of one of the three exceptions articulated by the Ninth Circuit in *Donovan v. Coeur d'Alene Tribal Farm* ("*Coeur d'Alene*"). 751 F.2d 1113, 1115 (9th Cir. 1985) (citing to *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99 (1960)).

Therefore, the Court must first decide whether the FLSA is a statute of general applicability. The Ninth Circuit soundly answered this question in *Snyder v. Navajo Nation*: "The FLSA is a statute of general applicability" that is silent on whether it applies to Indian tribes. 382 F.3d 892, 894-95 (9th Cir. 2004). Accordingly, the Court must now determine whether one of the three *Coeur d'Alene* exceptions apply:

> (1) the law touches "exclusive rights of self-governance in purely intramural matters;" (2) the application of the law to the tribe would "abrogate rights guaranteed by Indian treaties;" or (3) there is proof "by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations . . . ."

*Coeur d'Alene*, 751 F.2d at 1116 (quoting *United States v. Farris*, 624 F.2d 890, 893-94 (9th Cir. 1980)). The later two exceptions are not at issue here; rather, the focus is on the first exception - the tribal self-government exception.

"[T]he tribal self-government exception is designed to except purely intramural matters such as conditions of tribal membership, inheritance rules, and domestic relations from the general rule that otherwise applicable federal statutes apply to Indian tribes."

ORDER - 4

*Coeur d'Alene*, 751 F.2d at 1116 (determining that OSHA applied to the tribal-owned and operated farm because it participated in interstate commerce and employed non-Indians and Indians). The Ninth Circuit has analyzed the *Coeur d'Alene* "tribal self-government" exception in a number of cases - none involved a tribal casino. *See Snyder v. Navajo Nation*, 382 F.3d 892 (9th Cir. 2004); *Karuk*, 260 F.3d 1071 (9th Cir. 2001); *U.S. Dep't of Labor v. Occup. Safety & Health Review Comm'n*, 935 F.2d 182, 184 (9th Cir. 1991) (finding, notwithstanding the importance of the mill's revenue to the tribal government, that OSHA applied to a tribally-owned and operated saw mill because the mill employed a large number of non-Indians and sold its product in interstate commerce); *Lumber Indus. Pension Fund v. Warm Springs Forest Prods. Indus.*, 939 F.2d 683 (9th Cir. 1991) (applying ERISA to a tribally-owned and operated sawmill, even though such application may subject the mill to liability for money damages, because the tribe was still free to pass retirement plan ordinances). The Court finds *Karuk*'s thorough analysis to be the most helpful to resolve the issue presently before the Court.

In *Karuk*, the Ninth Circuit determined that the application of the Age Discrimination in Employment Act (ADEA) to a tribe's housing authority would touch upon tribal self-government. 260 F.3d 1071 (9th Cir. 2001). The Ninth Circuit emphasized that the tribal self-government exception involves two elements: (1) a self-governance element and (2) a purely intramural matter element. *Id.* at 1079 (citing *Coeur d'Alene*, 751 F.2d at 1116); *see also Reich v. Mashantucket Sand & Gravel*, 95 F.3d 174, 179-80 (2d Cir. 1996) (recognizing self-governance and purely intramural matter to be distinct elements when holding that the tribal-owned and operated

ORDER - 5

construction business did not satisfy the purely intramural matter element given the commercial and service nature of its work, its employment of non-Indians, and continued work on a casino operating in interstate commerce).

The Ninth Circuit analyzed the self-governance element first. *Karuk*, 260 F.3d at 1080-81. The Ninth Circuit highlighted that the federal law providing funding for the housing authority specified that the funds "should be used in a manner that recognizes the right of Indian self-determination and tribal self-governance." *Id.* at 1080. Based largely on the language of this federal funding law, the Ninth Circuit determined the housing authority was an arm of the tribe that occupied "a role quintessentially related to self-governance." *Id.* In reaching this conclusion, the Ninth Circuit's self-governance analysis identified two requirements: (1) the entity functions as an arm of the tribe and (2) the entity serves a governmental role or function. *Id.* (finding the housing authority "functions as an arm of the tribal government *and* in a governmental role" (emphasis added)). Accordingly, if the activity of the arm-of-the-tribe entity is essentially commercial, the governmental role or function requirement is not met and the self-governance element is not satisfied. *Id.*

In analyzing the purely intramural matter element, the Ninth Circuit recognized:

> In general, tribal relations with non-Indians fall outside the normal ambit of tribal self-government. Furthermore, intramural matters generally consist of conduct the immediate ramifications of which are felt primarily within the reservation by members of the tribe.

*Id.* at 1081 (quoting *Mashantucket Sand & Gravel*, 95 F.3d at 181). Factors that the Ninth Circuit looked at to assess whether the

ORDER - 6

dispute touched upon purely intramural matters included the parties to the dispute, whether the tribe had an internal process for adjudicating such disputes, the involvement of non-Indians in the tribal entity, and whether the tribal entity served non-Indians. *Id.* After weighing these factors, the Ninth Circuit determined the dispute between a tribal member and the housing authority, which employed and housed largely tribal members, touched upon a purely intramural matter. *Id.* Accordingly, the Ninth Circuit concluded that the ADEA did not apply to the housing authority because it touched exclusive rights of self-governance in purely intramural matters. *Id.* at 1082.

Unfortunately for district courts seeking clear guidance, the Ninth Circuit's 2004 *Snyder v. Navajo Nation* decision merged the elemental considerations articulated in *Karuk*. 382 F.3d 892 (9th Cir. 2004) (holding that the FLSA's overtime pay provision did not apply to tribal law-enforcement officers under the *Coeur d'Alene* tribal self-governance exception). For instance, in the following analysis, the self-governance and purely intramural matter elements are merged:

> The Navajo National's DPS maintains law and order within the reservation and this is a traditional governmental function. The FLSA contains an express exemption for state and local law-enforcement officers. 29 U.S.C. §§ 207(k), 207(*o*). Tribal law enforcement clearly is a part of tribal government and is for that reason an appropriate activity to exempt as intramural.

*Id.* at 895. The Court concludes the Ninth Circuit's merging likely resulted from the fact that tribal law enforcement officers primarily seek to ensure the safety of tribal members - a purely intramural matter. In addition, the Ninth Circuit's analysis was surely heavily influenced by the FLSA's statutory exemption for

ORDER - 7

state and local law-enforcement officers - a reasonable extension would be to apply this exemption to tribal law-enforcement officers as there is no practical distinction between the responsibilities of the state and local law-enforcement and tribal law-enforcement officers. Accordingly, the Court determines that *Karuk*'s tribal self-governance analysis still controls.

With *Karuk* as its guide, the Court analyzes whether the FLSA touches upon "exclusive rights of self-governance in purely intramural matters" under these circumstances. As articulated above, this analysis requires the Court to determine under the self-governance element whether the Casino functions as an arm of the Tribe and serves a governmental role or function, and then whether the FLSA touches upon a purely intramural matter.

The question of whether the Casino functions as an arm of the Tribe appears to be answered by the Ninth Circuit's *Allen v. Gold Country Casino* decision. 464 F.3d 1044 (9th Cir. 2006). In *Allen* – a private lawsuit against a tribal casino –, the Ninth Circuit held, "In light of the purposes for which the Tribe founded this Casino and the Tribe's ownership and control of its operations, there can be little doubt that the Casino functions *as an arm of the Tribe*." *Id.* at 1046 (emphasis added). The Ninth Circuit focused on one of IGRA's declared purposes, which is "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."[4]  25 U.S.C. § 2702(1). Similar to *Allen*'s

---

[4] The economic goal of a tribal casino is to make money - the same goal of any other commercial enterprise.

ORDER - 8

assessment of the IGRA's purpose, *Karuk*'s "arm of the tribe" analysis included an assessment of the Native American Housing Assistance and Self-Determination Act's purpose. Accordingly, after considering the stated purpose of the IGRA, *Allen*'s discussion of the IGRA, and the language of the Compact, the Court concludes that the Casino, which is owned and operated by the Tribe, functions as an arm of the Tribe given that its principal purpose is to develop tribal self-sufficiency by generating funds for tribal programs and generating jobs for tribal members - the arm-of-the-tribe requirement of the self-governance element is satisfied.

This conclusion, however, does not equate to a finding that the Casino serves a governmental role or function - the second self-governance element requirement. *See Mashantucket Sand & Gravel*, 95 F.3d at 180 ("That an entity is owned by a tribe, operates as an arm of a tribe, or takes direction from a tribal council, does not ipso facto elevate it to the status of a tribal government). And the Court finds the Casino does not serve a governmental role or function. "[O]peration of a casino is not a traditional attribute of self-government." *San Manuel Indian Bingo & Casino v. NLRB*, 475 F.3d 1306, 1315 (D.C. 2007). The interstate commercial nature of the Casino is the same as the tribal farming operation in *Coeur d'Alene*, the saw mills in the Warm Springs cases, and the construction company in *Mashantucket Sand and Gravel* – rather than the housing authority providing shelter in *Karuk* and the tribal law enforcement ensuring safety in *Navajo Nation*. The Tribe highlights, without the Casino's funding, the Tribe's ability to finance its governmental programs would be significantly hampered. The same could have been true of the commercial operations in Warm Springs,

*Coeur d'Alene*, and *Mashantucket*. However, the Ninth Circuit's *Coeur d'Alene* holding establishes that the economic impact of the application of a federal statute on the tribal business is not a factor to consider. *Coeur d'Alene*, 751 F.2d at 1116. This is for sound reason. A business-prudent tribe seeks a broad-based economy - not one simply dependent on a single enterprise. A tribal government solely dependent upon casino income faces economic difficulty during an economic downturn.[5] Utilizing the economic impact of the to-be-enforced federal law as a consideration in the *Coeur d'Alene* tribal self-governance exception analysis may discourage a tribe from diversifying its business endeavors. Accordingly, the amount of money an arm-of-the-tribe entity brings to the tribe does not influence the determination of whether that entity serves a governmental role or function. The fact that the Casino *funds* a significant portion of the Tribe's governmental services is irrelevant; the question rather is whether the Casino *serves* a governmental role or function. The Court finds it does not; the second requirement of the self-governance element is not satisfied.

In addition, the Court finds the FLSA does not touch upon primarily intramural matters in this instance. The Casino employs,

---

[5] For example, today, on September 24, 2008, casino stocks for a 52-week range evidenced the following downturn: (1) MGM Mirage ranged from 21.65 to 100.50, and as of today is at 29.95; (2) Wynn Resorts ranged from 69.27 to 176.04, and as of today is at 90.94; (3) Las Vegas Sands ranged from 30.56 to 148.76, and as of today is at 33.90. http://schwab.com.

ORDER - 10

and is open to, both tribal members and non-members. The Court is unaware of whether a tribal member or a non-member initiated the underlying complaint. The Casino employee manual addresses terms of employment; yet, any conflict between the FLSA and the terms of the employee manual does not touch upon a primarily intramural matter given that the Casino - an interstate commercial enterprise - employs both tribal members and nonmembers. The Court recognizes that the Ninth Circuit in *Karuk* acknowledged that a tribe generally has the "ability to make at least certain employment decisions without interference from other sovereigns." *Karuk*, 260 F.3d at 1081. The Casino, however, is significantly different than a tribe-run health center and a tribe-run housing authority. *See id.* (citing cases). The Casino is a for-profit commercial business participating in, and seeking through advertising, interstate business, largely of non-members.

The Court recognizes that one of the stated purposes of the IGRA is to encourage tribal self-sufficiency, and that the Ninth Circuit has "not cabined the intramural exception to those listed in *Coeur d'Alene*" – conditions of tribal membership, inheritance rules, and domestic relations. *Navajo Nation*, 382 F.3d at 895. However, the *Coeur d'Alene* exceptions are only to be applied "in those rare circumstances where the immediate ramifications of the conduct are felt primarily within the reservation by members of the tribe and where self-government is clearly implicated." *Id.* This is not a rare instance; the enforcement of the DOL administrative subpoena will not be felt primarily within the reservation by tribal members nor will it implicate self-government. Instead, a complete analysis of the *Coeur d'Alene* considerations "result[s] in a mosiac that is

ORDER - 11

distinctly inconsistent with the portrait of an Indian tribe exercising exclusive rights of self-governance in purely intramural matters." *Id.* at 181.

**CONCLUSION**

For the above-given reasons, the Court concludes the FLSA applies to the Casino and, therefore, the Court has jurisdiction over the administrative subpoena. Accordingly, the Tribe's motion to quash is denied. Because the Court declines to adopt the Report and Recommendation, the Court does not specifically address DOL's objections (Ct. Rec. 73). **IT IS HEREBY ORDERED:**

1. The Report and Recommendation **(Ct. Rec. 61)** is **NOT ADOPTED**.

2. Respondent's Motion to Quash **(Ct. Rec. 19)** is **DENIED**.

3. This matter is **REMANDED** to Magistrate Judge Imbrogno for further proceedings on Petitioner's Petition for Enforcement of an Administrative Subpoena (Ct. Rec. 1), but the administrative subpoena shall not be enforced any earlier than Thursday, October 9, 2008, which will provide the Tribe with time to obtain a stay of enforcement of the subpoena from the Ninth Circuit by Wednesday, October 8, 2008, as part of an appeal.

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and forward copies to counsel

**DATED** this ____24th____ day of September 2008.

                                        S/ Edward F. Shea
                                      EDWARD F. SHEA
                                UNITED STATES DISTRICT JUDGE

Q:\Civil\2007\0354.rejectRR.wpd

ORDER - 12